**In the Matter Of CANDLEWOOD SHORES ESTATES, INC., Debtor.**

**CANDLEWOOD SHORES ESTATES, INC., Plaintiff,**

v.

**Barry M. KLEIN, Defendant.**

**Bankruptcy No. 2–81–00516.
Adv. No. 2–81–0800.**

United States Bankruptcy Court, D. Connecticut.

May 13, 1982.

Robert C. Brunetti, Danbury, Conn., for plaintiff.

David L. Grogins, Danbury, Conn., for defendant.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

Candlewood Shores Estates, Inc., the debtor in a chapter 11 case, seeks in this proceeding[1] to invalidate a recorded mortgage deed from the debtor to Barry M. Klein, the defendant. The gravamens of the debtor's complaint are that the mortgage deed was unauthorized by the debtor and that the mortgage transaction violates statutory and common law principles concerning self-dealing by corporate insiders or officers.

### II.

### BACKGROUND

The debtor corporation was formed in December, 1962 by the defendant, Leroy Burke and Edward J. Henry, each owning one-third of the issued stock. Several years later, the defendant and Leroy Burke acquired the major portion of Mr. Henry's stock so that thereafter the defendant and Leroy Burke each owned 47% of the stock and Mr. Henry owned 6% of the stock.[2] The business of the debtor has been, and

---

1. This action was commenced in the Connecticut superior court on May 20, 1981, and was removed to the bankruptcy court on December 11, 1981.

2. Leroy Burke transferred his stock ownership to his wife, Barbara Burke, in 1977, but continued to be the person to act on behalf of this stock interest.

remains, the development of lakefront property in Brookfield, Connecticut, and includes the sales of lots and the maintenance of roads, a water system, and other improvements associated with the project. In general, since the date of incorporation Mr. Burke and the defendant operated the debtor's business with little concern for corporate organizational requirements. Both testified that no stockholder or director meetings have been held since 1962, and neither could recall directors ever having been elected.[3]

In 1977, Leroy Burke became ill and moved to Florida. Prior to his leaving, he gave a power of attorney to his nephew, Edward Hawley, who had been an employee of the debtor since 1971. According to the defendant, Burke, upon leaving Connecticut, told the defendant that he, the defendant, should take care of the debtor's business to the best of his ability. During the years between 1977 and 1981, either Leroy or Barbara Burke were in communication with Hawley and the defendant concerning the debtor's business. The information received by the Burkes was not good. Both Hawley and the defendant advised the Burkes that the debtor was losing money and was threatened with an antitrust lawsuit based upon restrictive covenants contained in the deeds utilized by the debtor to convey property. They were told that major road repairs had to be undertaken. Letters were sent periodically by the defendant to the Burkes noting the poor financial condition of the debtor. On three occasions during 1977 and 1978, the defendant went to Florida, visited the Burkes and discussed the debtor's business. The defendant claims that, during this period, he made unsecured loans to the debtor as the debtor had no cash with which to meet its obligations. The defendant testified that while he never told Burke the extent of these loans, Burke was aware that the defendant was making them. In a letter to Burke dated October 3, 1979, the defendant refers to the debtor owing the defendant $2,000.00 for money the defendant personally paid to a Mr. Goldstein. The defendant claimed at trial that at that time he was actually owed $70,685.77 by the debtor.[4]

Sometime during the fall of 1979, the defendant, Hawley and David S. Grossman, an attorney retained by the defendant for the debtor, met to discuss the financial condition of the debtor and the antitrust litigation. Hawley testified that the defendant and Attorney Grossman discussed the possibility of a mortgage being placed on the debtor's property for the purpose of "protecting" the property in the event the antitrust suit was lost. He recalled no other statements concerning the purpose of the mortgage. Grossman and the defendant both testified that during this meeting they also discussed the placing of a mortgage on the debtor's property to secure the defendant for the monies he had previously loaned to the debtor. On January 15, 1980, without Hawley's knowledge, a mortgage deed and note were executed by the defendant on behalf of the debtor in favor of the defendant in the amount of $85,000.00. The mortgage note was payable on demand with interest at 6% per annum payable quarterly. The mortgage deed was recorded in the Brookfield land records on February 13, 1981. The defendant does not claim that he ever notified the Burkes, Henry, or Hawley of the execution of this mortgage deed.

The testimony of the defendant is clear that at the time the mortgage was executed the debtor was unable to pay its debts as they accrued and that the debtor was insolvent. Upon Mr. Burke's return to Connecticut in January, 1981, he first learned of the execution of the mortgage. The Burkes and Henry took control of the debtor at that point, discharged the defendant, and caused the voluntary chapter 11 petition to be filed.[5] A certified public accountant,

---

3. From 1962 to 1981, Leroy Burke was the president and the defendant was the secretary-treasurer of the debtor.

4. Defendant's Exhibit Q.

5. The debtor's petition was signed by Edward J. Henry, as Secretary-Treasurer.

retained by the debtor, made an examination of the debtor's receipt and disbursement records. He testified at the hearing that as best he could determine from these records the debtor may owe the defendant $24,516.00 as of December, 1980, for transactions which commenced in 1968. The defendant claims $71,626.00 is due him. He testified that since he often used his personal checks to pay corporate obligations, the debtor's books would not show the correct amount due him.

At the trial, the defendant stated that the purpose of the mortgage was two-fold—to protect the assets of the debtor from creditors who were threatening litigation, and to secure his pre-existing loans to the debtor. He acknowledged that he had no explicit authority to execute the mortgage, but claimed it is to be implied from his general conversation with Leroy Burke when Burke told the defendant to do whatever was best for the debtor. In his post-trial brief, the defendant makes the further claims that he had apparent authority to execute the mortgage, that the debtor has ratified the transaction, and that the debtor is estopped to deny such ratification by virtue of its receipt of the benefits from the defendant.

### III.

### DISCUSSION

#### A.

■ When officers or directors transact business with their corporations, they are held to a strict standard of fair dealing. If a particular transaction is challenged, a director or officer bears the burden of showing that "any personal dealing with the corporation is fair, in good faith and for adequate consideration." *Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 534, 218 A.2d 526, 531 (1966). *See Hadden v. Krevit*, 186 Conn. 587, 442 A.2d 944 (1982); *Katz Corp. v. T. H. Canty & Co.*, 168 Conn. 201, 362 A.2d 975 (1975); *Massoth v. Central Bus Corp.*, 104 Conn. 683, 134 A. 236 (1926).

■ In general, there is nothing improper about a director or officer taking security for a contemporaneous loan to his corporation. 19 Am.Jur.2d *Corporations* § 1299 (1965); Annot., 31 A.L.R.2d 663 (1953). If the transaction has been fairly conducted and the corporation has received adequate consideration, courts will not set that transaction aside. Indeed, loans from directors or officers may be the last available alternative for an ailing corporation. In *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 23 L.Ed. 328 (1875), where a director loaned money to his corporation secured by a deed of trust, the Court commented that it would be ill-advised to prohibit such loans because it would deprive the corporation of the aid of "those most interested in giving aid judiciously, and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given." *Id.* at 589, 23 L.Ed. at 330.

■ A different rule exists for transactions wherein a director or officer seeks to acquire security for antecedent loans, particularly when the corporation is insolvent or nearly so. " '[W]here a corporation is insolvent in fact, or so nearly so that insolvency is practically certain, director creditors should not be permitted to appropriate the assets of the corporation to secure or pay a past indebtedness to the prejudice of other creditors.' " 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 908 (rev. perm. ed. 1975) (quoting *Jackman v. Newbold*, 28 F.2d 107, 111 (8th Cir. 1928)). The rationale behind this rule is that, by taking security for antecedent loans, a director or officer is breaching his fiduciary duties to the corporation and prejudicing the rights of creditors. In *Stuart v. Larson*, 298 F. 223 (8th Cir. 1924), the court stated:

the great weight of authority in this country is that the directors of an insolvent corporation, who are also creditors thereof, have no right to grant themselves preferences or advantages in the payment of their claims over other creditors, and such rule is merely applied common honesty. A director occupies a cer-

tain fiduciary position toward the stockholders and creditors. He has better facilities for knowing the condition of the company than have the other creditors, and he ought not to be permitted to use that position to benefit himself at their expense.

*Id.* at 227. To like effect is *Albert Richards Co. v. The Mayfair, Inc.*, 287 Mass. 280, 191 N.E. 430 (1934), a case in which a director took a mortgage from his corporation to protect its assets from creditors. The court observed that directors were

> to some extent trustees of the corporate property for the creditors, and should not be allowed to use their superior and far more intimate knowledge of the corporation's affairs to the detriment of creditors. There is no finding directly to the effect that the corporation was insolvent at the date of the giving of the mortgage, but that the corporation did not have sufficient assets or prospects of credit to meet the claims of those to whom it was indebted may fairly be inferred from the finding that [the director's] "purpose in procuring the execution and delivery of the note and mortgage was to protect the assets from the landlord and other creditors."

287 Mass. at 289, 191 N.E. at 434. *See also Cooper v. Mississippi Land Co.*, 220 So.2d 302 (Miss.1969); *Smith v. Mississippi Livestock Producers Ass'n*, 188 So.2d 758 (Miss. 1966).

■ While no Connecticut case appears to exist on the exact issue in this proceeding, Connecticut has specified by statute that self-dealing transactions between a corporation and its directors are voidable unless the self-dealing director sustains the burden of showing that the transaction was fair, in good faith and for adequate consideration. Conn.Gen.Stat. § 33–323 (1981).[6] *Cf. Hadden v. Krevit*, 186 Conn. 587, 590, 442 A.2d 944, 946 (1982). The defendant having concededly executed the mortgage to protect himself from other creditors of the debtor and to shield assets of the debtor from creditors, I conclude that the mortgage to the defendant is avoidable by the debtor-in-possession under the doctrine of the *Stuart* and *Albert Richards Co.* cases, *supra*.

### B.

■ I further conclude that the mortgage was never authorized by the debtor, never ratified by it, and that estoppel is not relevant to the present status of the debtor as a debtor-in-possession exercising the powers of a trustee. The defendant admits that there was nothing approaching specific authorization for the mortgage from the other officers and stockholders of the debtor. His attempt to construe a general statement made by Mr. Burke to the effect that the defendant should take care of the business to mean that he was authorized to grant himself a mortgage is unavailing. Burke denies any such intention and the defendant's contention is strained. The defendant had many opportunities to disclose

---

**6.** *Conn.Gen.Stat. § 33–323. Corporate transactions with directors and others.* (a) A contract or transaction between a corporation and a director thereof or a member of his immediate family, or between a corporation and any other corporation, firm or other organization in which a director of the corporation and members of his immediate family have an interest, shall not be voidable, and such director shall not incur any liability, merely because such director is a party thereto or because of such family relationship or interest, if: (1) Such family relationship or such interest, if it is a substantial interest, is fully disclosed, and the contract or transaction is not unfair as to the corporation and is authorized by (i) directors or other persons who have no substantial interest in such contract or transaction in such a manner as to be effective without the vote, assent or presence of the director concerned or (ii) the written consent of all of the directors who have no substantial interest in such contract or transaction, whether or not such directors constitute a quorum of the board of directors; or (2) such family relationship or such interest, if it is a substantial interest, is fully disclosed, and the contract or transaction is approved by the affirmative vote of the holders of a majority of the voting power of the shares entitled to vote thereon; or (3) the contract or transaction is not with the director or a member of his immediate family and any such interest is not substantial, subject, however, to the provisions of subsection (b) of this section; or (4) the contract or transaction is fair as to the corporation.

the execution of the mortgage but he never did. There was no ratification. While the defendant may have loaned the debtor monies from time to time, the precise net amount of such loans is open to serious question. Even if all of the defendant's claims were credited, they do not amount to the false sum of $85,000.00 indicated by the mortgage deed which the defendant caused to be placed on the land records.[7]

Judgment may enter that the mortgage from Candlewood Shores Estates, Inc. to Barry M. Klein dated January 15, 1980 and recorded in Vol. 133, Page 812 of the Brookfield land records is null and void.

This memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure.

Mart W. Swenson, Eau Claire, Wis., for debtor.

Steven R. Cray, Wiley, Rasmus, Colbert, Frasch & Norseng, S.C., Chippewa Falls, Wis., for creditor.

---

7. Conn.Gen.Stat. § 49–31b (1981) provides that a mortgage deed must furnish information from which there can be determined "the date, principal amount and maximum term of the note." *See also First Nat'l Bank & Trust Co. of Bridgeport v. Levy*, 17 Conn.Supp. 254 (1951) (underlying policy of Connecticut law is to prevent fraud by giving reasonable notice to interested parties of the extent of the transaction and leave no room for the substitution of fictitious claims).